**Dennis M. UY, M.D., Plaintiff,**

v.

**The BRONX MUNICIPAL HOSPITAL CENTER, Albert Einstein College of Medicine, the New York City Health and Hospitals Corporation, the City of New York and B. Robert Meyer, M.D., Defendants.**

**No. 95 Civ. 8090(CBM).**

United States District Court,
S.D. New York.

June 5, 1998.

Vladeck, Waldman, Elias & Engelhard, P.C. by Carrie H. Cohen, for Plaintiff Dennis M. Uy, M.D..

Noah A. Kinigstein, Former Attorney for Plaintiff Dennis M. Uy, M.D.

## MEMORANDUM OPINION

MOTLEY, District Judge.

### I. Background

Plaintiff, Dennis M. Uy, M.D. ("Dr.Uy"), commenced this action on September 21, 1995 alleging that his civil rights were violated pursuant to Title VII of the Civil Rights Act of 1964, as amended by 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1991, 42 U.S.C. § 1983, New York State Civil Rights Law § 290 et seq., New York City Human Rights Law, New York City Administrative Code § 8–101 et seq., and state common law.

Since 1994, when plaintiff first sought legal advice on this matter, he has been represented by four different attorneys. Plaintiff's first attorney was C. Vernon Mason ("Mr.Mason"), with whom plaintiff first consulted on November 29, 1994.[1] Dr. Uy's second attorney was Ingrid N. Davis ("Ms. Davis"), who was retained on March 28, 1995.[2] Thereafter, in May, 1996, Dr. Uy retained his third attorney, Noah A. Kinigstein ("Mr.Kinigstein").[3]

---

1. Dr. Uy paid Mr. Mason a consultation fee of $100.00, and a retainer fee of $10,000.00.

2. Dr. Uy paid Ms. Davis a total of $2,018.20.

3. Dr. Uy has already paid Mr. Kinigstein a total of $43,142.50 in attorney's fees over a period of one year. Dr. Uy made the following payments to Mr. Kinigstein:

| Date | Amount |
| --- | --- |
| May 7, 1996 | $150.00 (Consultation Fee) |
| May 8, 1996 | $5,000.00 (Retainer Fee) |
| July 2, 1996 | $5,000.00 (Retainer Fee) |
| July 31, 1996 | $3,500.00 (Retainer Fee) |
| September 5, 1996 | $5,000.00 (Retainer Fee) |
| November 25, 1996 | $4,000.00 (Retainer Fee) |
| January 29, 1997 | $5,000.00 (Retainer Fee) |
| April 18, 1997 | $3,492.50 (Retainer Fee) |

On June 10, 1997, the court removed Mr. Kinigstein from this case, primarily due to his May 28, 1997 letter to the court stating that he was "extremely busy on other cases."[4] The court then appointed the law firm of Vladeck, Waldman, Elias & Engelhard, P.C. ("Vladeck") to represent Dr. Uy pursuant to Title 28 U.S.C. § 1915(e)(1). Thereafter, the parties entered into an agreement settling the case before the trial date in November, 1997. (Plaintiff's Exh. 2).

In two letters to the court, dated June 11, 1997 and November 18, 1997, Mr. Kinigstein protested his removal from the case and requested counsel fees based on the lien on the case which the court had given him. On January 6, 1998, the court held a hearing to review Mr. Kinigstein's application for attorney's fees.[5]

## II. The Nature of Mr. Kinigstein's Work

At the time Mr. Kinigstein was retained, the plaintiff's original complaint had already been filed. (Tr. at 12). In July, 1996, Mr. Kinigstein amended the complaint by omitting a claim of sexual harassment and adding a claim of retaliation. (Tr. at 14). Based on Mr. Kinigstein's time records, the court finds and concludes that Mr. Kinigstein spent approximately 7 hours amending the complaint.[6]

| | |
|---|---|
| May 12, 1997 | $4,000.00 (Retainer Fee) |
| June 5, 1997 | $5,000.00 (Retainer Fee) |
| February 10, 1997 | $1,000.00 (Retainer Fee for Immigration Issues) |
| April 1, 1997 | $1,000.00 (Retainer Fee for Immigration Issues) |
| May 12, 1997 | $1,000.00 (Retainer Fee for Immigration Issues) |

In addition to $43,142.50 in attorney's fees, Dr. Uy also paid Mr. Kinigstein $524.85 in deposition costs.

In addition to $43,142.50 in attorney's fees, Dr. Uy also paid Mr. Kinigstein $524.85 in deposition costs.

4. On May 28, 1997, Mr. Kinigstein wrote a letter to the court requesting an extension of time in which to file the parties' pre-trial order. In the letter, he stated that he is "a solo practitioner and [his] schedule has kept [him] extremely busy on other cases."

5. Mr. Kinigstein is seeking $80,232.00 in attorney's fees.

Over the course of his representation of Dr. Uy, Mr. Kinigstein took four depositions. (Tr. at 25). Mr. Kinigstein conducted a telephonic deposition of Mr. Goldstein on May 8, 1997, which lasted approximately half an hour. (Tr. at 18). Preparation time for the deposition totaled approximately three and a half hours. On November 13, 1996 Mr. Kinigstein deposed Hezekiah Maddox. Preparation time for the deposition, and the deposition itself, totaled five hours. On January 23, 1997, Mr. Kinigstein deposed Rolando Ortiz. Preparation time for the deposition, and the deposition itself, totaled approximately four and a half hours. (Tr. at 21). On July 30, 1996 Mr. Kinigstein deposed Dr. B. Robert Meyer ("Dr.Meyer"). Preparation for the deposition took approximately two and a half hours.

Dr. Uy was deposed by defendants on July 29 and July 31, 1996. (Tr. at 26). Preparation for the deposition and the deposition itself totaled ten and a half hours.[7]

On September 9, 1996, Mr. Kinigstein attended a mediation session with his client and Etta Ibok (defendants' attorney) at the courthouse. (Tr. at 27). On that day, Mr. Kinigstein spent less than four hours preparing for the mediation, traveling to court for the mediation, and engaging in the mediation itself.[8] The attempt to mediate the case

6. At a pre-trial conference on June 10, 1997, Mr. Kinigstein requested the opportunity to amend the complaint a second time to state a breach of contract claim, which the court granted. However, due to Mr. Kinigstein's subsequent removal from the case, he never filed a second amended complaint. (Tr. at 15–16).

7. The court estimates that Mr. Kinigstein spent eight hours actually taking and defending depositions. Since Mr. Kinigstein's time records do not distinguish between time spent in depositions and time spent preparing for them, the court was forced to estimate. However, the court notes that attorneys should not keep such vague and incomplete time entries. In some instances, such sloppy time records might justify a court's refusal to award any attorney's fees at all.

8. Again, Mr. Kinigstein's time records are not clear. At the hearing on January 6, 1998, Mr. Kinigstein claims that, from August 20, 1996 to September 9, 1996, he spent approximately 10 hours preparing for the mediation and 3.75 hours in the mediation itself. (Tr. at 27–29).

failed. Mr. Kinigstein claims he made attempts to settle the case, (Tr. at 29), but there is only one entry in his time records which mentions "settlement discussions." [9]

Mr. Kinigstein spent approximately 30 hours working on the pre-trial memorandum and the joint pre-trial order, according to his time records.[10]

Mr. Kinigstein spent approximately five hours working on a motion in limine regarding plaintiff's alleged prior conduct.

On June 10, 1997, Mr. Kinigstein appeared before the court for a final pre-trial conference, which lasted all day.[11] Trial had been scheduled to commence the following day.

According to Mr. Kinigstein's time records, he spent 13 hours preparing his application for attorney's fees from December 18, 1997 to December 29, 1997.

Now, Mr. Kinigstein comes before this court seeking $80,232.00 in attorney's fees and costs.[12] The court hereby makes the following findings of fact and conclusions of law.

### III. Findings of Fact and Conclusions of Law

Rule 11 of the Federal Rules of Civil Procedure requires that an attorney conduct a reasonable investigation of the facts before filing papers with the court. Rule 11(b) states, in relevant part, as follows:

"By presenting to the court ... a pleading, written motion, or other paper, an attorney

... is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,-

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation ...

(3). the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery ..."

It should be noted that Mr. Kinigstein violated Rule 11 by failing to conduct a reasonable inquiry of the merits of plaintiff's claim of discrimination under Title VII. Rather than conducting a reasonable inquiry, Mr. Kinigstein relied on Dr. Uy's statement that Dr. Meyer had told him that he "could be terminated at any time because he was a foreigner." Although such a statement requires evidentiary support in addition to the client's mere assertion, Mr. Kinigstein made no real effort to substantiate the alleged statement until *after* he accepted the case and took Dr. Meyer's deposition. (Tr. at 9–12). Thus, Mr. Kinigstein agreed to represent Dr. Uy before he even checked to see if his client in fact had a Title VII case. According to Rule 11, Mr. Kinigstein should have conducted a reasonable inquiry about the factual allegations underlying his client's complaint *before* he accepted and worked on the case. Such a violation in and of itself, of

However, according to his time records, only one entry prior to September 9, 1996 specifically mentions preparation for the mediation (on September 3, 1996, Mr. Kinigstein apparently spent 3 hours on a "mediation memo draft"). Additionally, the entry on September 9, 1996 for 3.75 hours includes not only the mediation, but travel to the mediation and the review of other documents. Furthermore, there is an entry on September 17, 1996 for 5.5 hours which states "travel to and mediation", but Mr. Kinigstein failed to mention this at the January 6, 1998 hearing. Because of Mr. Kinigstein's sloppy and incomplete time records, the court is forced to estimate that approximately two hours were actually spent in the mediation session itself.

9. The entry on July 24, 1996 includes a "settlement discussion" as one of several activities which took place over a four hour time period.

10. Again, Mr. Kinigstein's time records are not clear. Since Mr. Kinigstein frequently combines several tasks under one time entry, the court is forced to estimate in some instances.

11. Mr. Kinigstein's time entry for this day, erroneously listed as June 11, 1997, states that 10 hours were spent preparing for and arguing at the hearing. The court notes that approximately *six hours were spent in court.*

12. Mr. Kinigstein claims that Dr. Uy owes him $78,960.00 in attorney's fees (263.2 hours at $300.00 per hour). Additionally, Mr. Kinigstein is seeking $1272.00 for transcript costs, deposition costs, and the purchase of an index number.

course, warrants a sanction. *See Forbes v. Merrill Lynch, Fenner & Smith*, 1998 WL 164920 (S.D.N.Y.1998).[13]

The court, nevertheless, finds that Mr. Kinigstein is entitled to $14,200.00 in attorney's fees.

According to the New York Code of Professional Responsibility, an attorney "shall not enter into an agreement for, charge or collect an illegal or excessive fee." DR 2–106. This court finds and concludes that, based on the services Mr. Kinigstein performed for the plaintiff, the $80,232.00 in fees which Mr. Kinigstein is seeking is excessive. As the court details below, if Mr. Kinigstein is entitled to any compensation for his work on this case, he only properly earned $14,200.00. Since Dr. Uy has already paid Mr. Kinigstein $43,142.50 in attorney's fees, this court finds and concludes that Mr. Kinigstein must return $28,942.50 to Dr. Uy.

### A. Plaintiff's Case was Weak

█ The court finds and concludes that plaintiff's case of discrimination under Title VII was very weak. Most of the time Mr. Kinigstein spent on this case was not well spent, because he should have known that there was little chance of winning the case and it should have been settled.[14] The case was primarily based on the assertion that Dr. Meyer made negative comments about plaintiff's Filipino background. Yet, after Mr. Kinigstein conducted four depositions, plaintiff's case appeared to be even weaker because there was no corroboration for his claim of nationality discrimination.

In regards to a possible breach of contract cause of action, Mr. Kinigstein should have known that such an action was not sustainable. Mr. Kinigstein was well aware of the fact that a hearing had been held at the hospital. (Tr. at 33, 35). Mr. Kinigstein also knew that plaintiff's first attorney, Mr. Mason, waived plaintiff's right to appear at the hearing, (Tr. at 35), so plaintiff did not have a

valid breach of contract claim. Yet, despite the fact that plaintiff had waived his right to a breach of contract cause of action, Mr. Kinigstein still moved to amend the complaint on this basis. (Tr. at 15–16).

Under the circumstances of this case, no reasonable lawyer would have spent so much time preparing for trial instead of settlement negotiations. Thus, in this case, Mr. Kinigstein cannot be paid for what a reasonable lawyer is supposed to do. He is not entitled to the over $80,000 which he is seeking. If he is entitled to any compensation at all, he should only be compensated for time spent in court at the pre-trial conference on June 10, 1997, time spent in depositions, time spent preparing the first amended complaint, time spent preparing the joint pre-trial order and the pre-trial memorandum, time spent preparing the motion in limine regarding plaintiff's alleged prior conduct, and time spent preparing the application for attorney's fees.

### B. Amount of Compensation

Although the amount of attorney's fees awarded is "largely within the discretion of the district court," the Second Circuit has established a procedure to calculate such awards:

> "First, the court should establish a 'lodestar' figure, obtained 'by multiplying the number of hours expended by each attorney involved in each type of work on the case by the hourly rate normally charged for similar work by attorneys of like skill in the area.' ... Next, the court may adjust the lodestar figure upward or downward to take account of such subjective factors as the risk and complexity of the litigation and the quality of the representation." *Cohen v. W. Haven Bd. of Police Comm'rs*, 638 F.2d 496 (2d Cir.1980).

Mr. Kinigstein requests compensation at the rate of $300—$325 per hour.[15] The court rejects this rate for two reasons.

---

13. The court removed Mr. Kinigstein from this case for the reasons set forth in Appendix A of this opinion.

14. At the hearing before this court held on January 6, 1998, Mr. Kinigstein acknowledged that the case should have been settled. (Tr. at 36).

15. As the court noted earlier, Mr. Kinigstein's application for attorney's fees is sloppy and inaccurate. At some points in his papers, he states that he is seeking compensation at the rate of $300.00 per hour. *See, e.g.*, Memorandum of Law in Support of Plaintiff's Application for At-

First, Mr. Kinigstein fails to distinguish between his out-of-court/ office work and his in-court work. (Tr. at 30). As the Second Circuit has noted, "a different rate of compensation may well be set for different types of litigation tasks..." *Cohen v. W. Haven Bd. of Police Comm'rs*, 638 F.2d 496, 505 (2d Cir.1980). Thus, "different rates can be awarded for court appearances and depositions, office time and travel time." *Capozzi v. City of Albany*, 565 F.Supp. 771, 775 (N.D.N.Y.1983). *See also Sharrock v. Harris*, 489 F.Supp. 913 (S.D.N.Y.1980) (the court may consider circumstances such as the complexity of the issues or the amount of required courtroom appearances in arriving at a reasonable rate).

Second, the rate Mr. Kinigstein is seeking is unreasonably high. A fee of $300—$325 per hour is a rate more often charged by major firms with an established record of litigating Title VII cases.[16] Conspicuously absent from Mr. Kinigstein's affidavit is a list of Title VII cases which he has worked on, and the rates he has charged or has been awarded for them. In fact, with the exception of one unique first amendment case in which he was allegedly awarded $300.00 per hour, Mr. Kinigstein fails to cite *any* cases in which he earned such a high

hourly fee. Yet, in this case, Mr. Kinigstein is seeking $300.00—$325.00 per hour—despite the fact that he never even tried this case, and despite the fact that the case is not overly complex or difficult.

Thus, the court rejects Mr. Kinigstein's extremely high blanket request of $325.00 per hour. The court finds and concludes that Mr. Kinigstein shall be compensated at two different rates: one for his out-of-court/ office work, and one for his courtroom appearances.[17] Based on prevailing rates in similar cases, the court finds and concludes that Mr. Kinigstein shall receive $150.00 per hour for out-of-court/ office work, and $200.00 per hour for court appearances and depositions.

Therefore, the court finds and concludes that Mr. Kinigstein is entitled to receive $14,200.00 (this figure includes $11,400.00 for out-of-court/ office work [18] and $2,800.00 for courtroom appearances and depositions [19]). However, since Dr. Uy has already paid Mr. Kinigstein $43,142.50 in attorney's fees, Mr. Kinigstein is directed to return $28,942.50 to Dr. Uy, since this money was not properly earned.

SO ORDERED.

---

torney's Fees, pg. 8. However, at other points, he states that he is seeking compensation at the rate of $325.00 per hour. *See, e.g.,* Affirmation in Support of Motion for Attorney's Fees, pg. 12.

16. *Notably, the only similar cases from this district which Mr. Kinigstein cites in support of his request for $325.00 per hour involved litigators with exceptional experience in this field.*

17. *Out-of-court/ office work includes preparation for depositions, preparation of the joint pre-trial order and the pre-trial memorandum, preparation of the motion in limine, preparation of the amended complaint, and preparation of the application for attorney's fees. For the purposes of Kinigstein's attorney's fees application, courtroom appearances shall include time spent in court as well as time spent in depositions.*

18. The court reached this figure by calculating as follows:

| | |
|---|---|
| Preparing First Amended Complaint | 7 hours |
| Preparing for Depositions | 19 hours |
| Mediation Session | 2 hours |
| Preparing Pre–Trial Memo & Pre–Trial Order | 30 hours |
| Preparing Motion In Limine | 5 hours |
| Preparing Attorney's Fees Application | 13 hours |
| Total | 76 hours x $150 per hour = $11,400.00 |

19. *The court reached this figure by calculating as follows:*

| | |
|---|---|
| Hearing on June 10, 1997 | 6 hours |
| Taking and Defending Depositions | 8 hours |
| Total | 14 hours x $200 per hour = $2,800.00 |

APPENDIX A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Dennis M. Uy, M.D., Plaintiff,

v.

The Bronx Municipal Center Albert Einstein College of Medicine; The New York City Health and Hospitals Corporation, and the City of New York and Robert Meyer, M.D., Defendants.

95 Civ. 8090 (CBM)

New York, N.Y.
June 10, 1997*
10:35 a.m.

Before: HON. CONSTANCE BAKER MOTLEY, District Judge

APPEARANCES

NOAH A. KINIGSTEIN,

Attorney for Plaintiff

OFFICE OF THE CORPORATION COUNSEL

Attorney for Defendants

BY: ETTA IBOK
CHRISTOPHER REO
Assistant Corporation Counsel

opportunity to amend his complaint, and the Court granted plaintiff the opportunity to amend the complaint at that time because plaintiff's attorney argued that he had just gotten the case from another attorney who had not appeared in court and who was not working on the case. It is now, I believe, a year—I am not looking at my calendar—it is a year or almost a year from then, and he is moving to amend his complaint again. At this time I think it is fundamentally unfair to the defendants because, three months down the road, plaintiff is going to find another cause of action and he is going to request another opportunity to amend his complaint yet another time and with another cause of action.

THE COURT: I have to rule on that, so let's not imagine something that hasn't been

*Editor's Note: Appendix A is a transcript of part

heard. But the point which you are missing is that every case is important to the plaintiff. We have a case here of a plaintiff who, as I just pointed out, is in danger of losing the opportunity to become a doctor. That is not a minor matter. I can't sit here and deny him the opportunity to save his career if he can. He has a lawyer who is a single practitioner. That is the problem this plaintiff has had, unfortunately. He has had a series of lawyers who really couldn't give this case the attention it warrants. That is the problem. He has a case here that requires a lawyer with high skill, to save his career. And I think that what should be done is—is the plaintiff working?

MR. KINIGSTEIN: No.

THE COURT:—maybe what should be done is that the Court should appoint a lawyer to represent him, because he doesn't. Of course, he doesn't have any money to hire a lawyer.

MR. KINIGSTEIN: I am sorry, your Honor?

THE COURT: Read back what I just said, please.

(Record read)

MR. KINIGSTEIN: Your Honor, I am a little unclear. Are you saying—I mean, I am prepared to represent the plaintiff.

THE COURT: It is obvious that you are a single practitioner—

MR. KINIGSTEIN: Right.

THE COURT:—with a lot of cases, and I just said this is a case which requires a great deal of work. The man's career is at stake.

MR. KINIGSTEIN: I understand that.

THE COURT: And in order to save it, he has to have a lawyer who can give him the time and skill required for it to save that case, to save his career. That is what I think. The man needs a lawyer. Are you located in New York, the plaintiff?

DR. UY: Yes, your Honor.

THE COURT: And you are not working, you say?

DR. UY: I am not working, your Honor.

of a hearing.

THE COURT: What are you doing at this time?

DR. UY: I am involved in my church, your Honor, helping the needy people and helping with the missions group.

THE COURT: I see. And you are not getting any money, is that it?

DR. UY: I am not getting anything. It is a volunteer job, your Honor.

THE COURT: All right. What I think I am going to do is to recess this case until the fall. As I have indicated, the Court is going to appoint a lawyer to represent the man. Mr. Uy, you are going to have to sign an affidavit that you don't have the money to hire a lawyer. Do you understand that? You have to tell me what your income is, and you said it is nothing, but you have to put that in an affidavit. Do you know that?

DR. UY: Yes, your Honor.

THE COURT: And the Court is going to appoint a lawyer to represent you. If any recovery is made, of course, the lawyer can be paid out of that under the statute, I think it is 1915 or 1927, Title 18.

Now, Mr.—

MR. KINIGSTEIN: Kinigstein.

THE COURT:—kinigstein, you are a very good lawyer, I am not saying you are not a good lawyer, but obviously you are overburdened, and this man needs attention. I don't want to sit here and see this man, if he has a case, lose it because he doesn't have counsel who has the time and the requisite experience to represent him. So it is not because I think you are not competent to represent him. I do. But I do think that we have spent a lot of time and he has had the unfortunate history of having a couple of other lawyers.

That is Title 28, United States Code, Section 1915(e)(1).

In any event, attorney's fees are recoverable under Title VII, 1983, are they not?

MR. KINIGSTEIN: Correct, your Honor, they are.

THE COURT: That is what I am going to do. I am going to set this trial down for sometime in the fall so that the lawyer who is appointed can have time to look into this. I am going to set this case down for trial November 10. The next pretrial conference in this case will be June 24 at 11:30.

DR. UY: Your Honor, can I say something? I just want to inform the Court that I am not working right now, and my immigration status is really a problem. I am asking the Court if the Court can write a letter to the Immigration and Naturalization Service, if they could have me stay here legally until after the conclusion of the lawsuit (immigration status). Because right now I am in limbo. In fact, my lawyer, Mr. Kinigstein, had sent a letter to immigration for a stay of my status here until after the conclusion of the lawsuit. So I am just wondering if—

THE COURT: Have they called you down?

DR. UY: They haven't called me down. That is what I am afraid of. If they find out that I am not working right now, they might deport me out of this country. But Immigration and Naturalization Service are not aware that there is a pending lawsuit in the federal court here. So I am wondering if the Court can write a letter just to let them know there is a Court case going on here.

THE COURT: I will look into the procedure for that and let them know that you have a pending case. All right. The clerk will give you a copy of the order.

MS. IBOK: I am sorry, your Honor. I believe the Court has set a conference for—

THE COURT: June 24.

MS. IBOK:—June 24. What is the purpose of the conference, so I can prepare for it?

THE COURT: Yes. I expect by then to have a new lawyer. As I said, I am going to appoint a lawyer to represent the man, as he is an indigent person. There may be merit to the case. We have gone over a lot of it, and he may have a contract claim, he may have a Title VII claim, as I indicated. The new lawyer will get a copy of this conference

today in which I have made several rulings. They, of course, may want to take up some of those again. We will have to wait and see.

But I think the problem is, as I have said, this case has been filed since the end of '95, so it has been here a year and a half already, and all I have seen is the plaintiff here with lawyers who couldn't pay any attention to his case and couldn't handle it, because they are much too busy.

MR. KINIGSTEIN: With all due respect, your Honor, I have been handling this case for the past year or so, and I have given it a tremendous amount of attention in my office. I would like to state for the record, your Honor, that, whatever your Honor decides to do that you feel is in the best interest for justice, I understand; on the other hand, I think that to make any allusion that it is because of somebody not doing their job in this particular case, in particular me, to that I respectfully take exception.

THE COURT: I have already said that I thought you were a competent lawyer.

MR. KINIGSTEIN: I understand that, your Honor.

THE COURT: I am simply saying that I think single practitioners, as everyone knows, have a difficult time. There is no dispute as to that.

MR. KINIGSTEIN: There is no dispute—

THE COURT: And I expect to appoint a lawyer who doesn't have any problem with that, who has the time and the assistance that would be needed to give this man a fair trial.

MR. KINIGSTEIN: Well—

THE COURT: And that is what I intend to do. I am not at all saying that you are not a competent lawyer. I think you have done a good job, but getting this pretrial order together at the last minute is a clear indication of what I have said. This should have been done a long time ago.

MR. KINIGSTEIN: What, your Honor? The amendment?

THE COURT: The pretrial order. We just got it, didn't we?

MR. KINIGSTEIN: You got it Friday, your Honor.

THE COURT: That is what I am saying.

MR. KINIGSTEIN: That is when it was due.

THE COURT: But the trial was scheduled for today. I sent the jury home.

MR. KINIGSTEIN: Your Honor, you ordered it to be submitted by Friday.

THE COURT: Yes.

MR. KINIGSTEIN: I submitted it Friday.

THE COURT: Because I was trying to give you a trial date to get this man's case over with. A year and a half?

MR. KINIGSTEIN: Whatever your Honor decides, of course, is fine, and of course it is appreciated, frankly, you know, but I do think that to say that there was any kind of activity that didn't comport with legal procedure in any which way I think is wrong in this case.

THE COURT: All I am saying is you were overburdened because you are a single practitioner. Mr. Mason was overburdened and somebody else came in here with the same thing. You are the third lawyer he has had.

MR. KINIGSTEIN: Yes. Mr. Mason was disbarred.

THE COURT: Well, whatever. He was one of the many lawyers the man has had. The man has had some difficulty because he doesn't have any money. That is the main thing, isn't it?

MR. KINIGSTEIN: All right.

THE COURT: So that is all I am saying.

MR. KINIGSTEIN: Do you require my presence on June 24?

THE COURT: I would think you would turn over to the new lawyers, if I get one by then—

MR. KINIGSTEIN: Sure.

THE COURT:—the file and give them whatever help you think. You would have a lien, I guess, for whatever work you have done.

MR. KINIGSTEIN: All right.

THE COURT: But I think the man needs a lawyer, myself.

I have your letter, Mr. Kinigstein, of May 28 in which you wrote me in which you said, "I am requesting this short adjournment because I am a solo practitioner and my schedule has kept me extremely busy on other cases." I am quoting you. That is what gave me the idea when I got this letter.

MR. KINIGSTEIN: Fine, your Honor.

THE COURT: This is a case that requires a great deal of time.

MR. KINIGSTEIN: All right.

THE COURT: And you wrote that you were a single practitioner. You asked for an adjournment at the eleventh hour, so to speak.

MR. KINIGSTEIN: Well, all right, your Honor. I understand your concerns and I respect whatever the Court wants to do.

THE COURT: Thank you.

MR. KINIGSTEIN: Thank you.

THE COURT: Good night.

DR. UY: Your Honor, when will I be informed about the new attorney?

THE COURT: As soon as I can. In the next few days.

DR. UY: Thank you, your Honor.